UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 19-cv-24440-BLOOM/Louis

SEASONS HOSPICE & PALLIATIVE
CARE OF SOUTHERN FLORIDA,

    Plaintiff,

v.

U.S. DEPARTMENT OF HEALTH
AND HUMAN SERVICES,
*Secretary Alex M. Azar, II*

    Defendant.

_____/

# ORDER

**THIS CAUSE** is before the Court upon Plaintiff's Motion for Summary Judgment, ECF No. [26] ("Plaintiff's Motion") and Defendant's Cross-Motion for Summary Judgment, ECF No. [31] ("Defendant's Motion") (collectively, the "Motions"). The Court has considered the Motions, all opposing and supporting submissions, the record in this case, the applicable law, and is otherwise fully advised. For the reasons set forth below, Plaintiff's Motion is denied, and Defendant's Motion is granted.

    **I.**    **BACKGROUND**

The case arises from an adverse agency decision of the Medicare Provider Reimbursement Review Board ("Board") related to Plaintiff's non-election to use the "streamlined method" for calculating the aggregate cap for its 2012 cap determination. The Complaint alleges that Plaintiff was eligible to make a one-time election to use the streamlined method, but it never received the initial 2012 cap determination letter supposedly transmitted by Palmetto GBA ("Palmetto"), the

Medicare Administrative Contractor ("MAC") tasked by the Centers for Medicare & Medicaid Services ("CMS") with calculating Plaintiff's aggregate cap for the cap year 2012, including determining any overpayment due to Medicare by Plaintiff. Plaintiff maintains that pursuant to the governing regulations, hospice providers like Plaintiff were required to elect-in to use the streamlined method within 60 days of receipt of the MAC's 2012 cap determination. The failure to do so results in the proportional method for calculating the aggregate cap being imposed for the 2012 cap determination and all subsequent cap year determinations.

The Complaint alleges that Palmetto's practice was to include a notice entitled "Your Grandfathering Rights" as part of its 2012 cap determination letters, which notice informed the hospice provider of its rights to elect the use of the streamlined method. Palmetto allegedly sent a 2012 cap determination letter and accompanying notice to Plaintiff on December 5, 2013. According to Plaintiff, it has no record of ever receiving the cap determination letter or the notice. On September 25, 2015, Palmetto sent Plaintiff a revised 2012 cap determination letter without an accompanying notice regarding the right to elect the streamlined method for calculating the aggregate cap. The revised cap determination letter stated that Plaintiff needed to refund Medicare overdue amounts based on calculations made under the proportional method.

Plaintiff appealed the revised cap determination to the Board, which held a hearing and issued a decision finding no error in the methodology used by Palmetto (the proportional method) to calculate Plaintiff's aggregate cap limitation for the 2012 cap year. According to Plaintiff, the Board's decision was arbitrary, capricious, an abuse of discretion, and not in accordance with law. As such, it seeks judicial review of the Board's decision under the Administrative Procedure Act, 5 U.S.C. § 706(2)(A) (the "APA"). In Plaintiff's view, the Board erroneously found that the initial 2012 cap determination letter purportedly sent on December 5, 2013 should be "deemed received"

for purposes of starting the 60-day election clock. Plaintiff further contends that the Board wrongly found that it was Plaintiff's burden to affirmatively elect the streamlined method. Plaintiff maintains that the relevant regulation requires that the right to make an election to use the streamlined method be made within 60 days of receipt of the final 2012 cap determination (here, the revised 2012 cap determination), not just an initial 2012 cap determination. Based on this premise, Plaintiff asserts that the Board erred in concluding that Palmetto was not required to inform Plaintiff of its right to elect the streamlined method when it issued the revised 2012 cap determination letter. Defendant filed its Answer and Affirmative Defenses, contending that the Board's final decision is in accordance with applicable legal standards and is supported by substantial evidence. ECF No. [18].

The parties have each moved for summary judgment as to whether the Board's decision was arbitrary and capricious, supported by substantial evidence in the record, and in accordance with the law. Plaintiff's makes two overarching arguments. First, the Board disregarded key evidence showing that the December 5, 2013 initial cap determination letter was either never sent by the MAC or was never received by Plaintiff. ECF No. [26] at 11. Plaintiff maintains that the Board improperly applied the mailbox rule because the MAC failed to meet its burden of proof of mailing, but that even if the mailbox rule applied, Plaintiff rebutted the presumption of receipt. *Id.* at 12-21. Second, the Board acted arbitrarily, capriciously, and abused its discretion by incorrectly applying the unambiguous language of the hospice cap regulation, 42 C.F.R. § 418.309(d)(2)(ii). *Id.* at 21. According to Plaintiff, the regulation gives hospice providers the right to make the election to use the streamlined method "no later than 60 days after receipt of its 2012 cap determination," not just an initial cap determination. *Id.* at 22-24. Further, the Board improperly

found that the burden was on Plaintiff to affirmatively elect the streamlined method without first receiving their 2012 cap determination. *Id.* at 24-26.

Defendant, in urging that the Board's decision should be affirmed, raises four arguments. First, the Board properly determined that Plaintiff failed to meet its burden of proof because the record contains substantial evidence that the December 5, 2013 letter was properly sent. ECF No. [32] at 6-8. Second, Plaintiff's attempt to rebut the presumption that it received the letter was deficient, and Plaintiff otherwise failed to prove compliance with the regulation. *Id.* at 9-10. Third, Plaintiff made no effort to contact Palmetto about the letter or its election of a cap methodology. *Id.* at 10-13. Finally, the regulation does not allow for a second election following a reopening or revision to a cap determination. *Id.* at 13-14.

The Motions are ripe for consideration.

## II.     RELEVANT FACTS

Based on the parties' statements and counterstatements of material facts, ECF Nos. [27], [33], and [38], along with evidence in the record, the following facts are not genuinely in dispute unless otherwise noted.

Plaintiff is a provider of hospice and palliative care located in Miami, Florida and is one of 29 hospice providers operating throughout the nation under the "Seasons" name.[1] SOMF ¶ 1. Its corporate office is located in Illinois. *Id.* at ¶ 2. CMS, through MACs, is responsible for reimbursing hospice providers on a per diem basis for services provided to its beneficiaries. *Id.* at ¶ 5. Palmetto was the MAC for Plaintiff during all time periods relevant here. *Id.*

---

[1] For ease of reference, the Court uses "SOMF ¶" when citing to the particular fact stated in the parties' statements of material fact. Citations to the hearing transcript for the proceedings held on May 23, 2019 will use "ECF No. [19-1] at 00__: Hrg. Tr. p. __."

Under the Medicare Act, 42 U.S.C. § 1395f(i)(2), hospice providers are subject to an annual cap on Medicare payments. *Id.* at ¶ 11. Any payments made to a hospice during a cap period that exceed the cap amount are considered overpayments and must be refunded to Medicare. *Id.* at ¶ 13. Palmetto was tasked by CMS with calculating Plaintiff's aggregate cap for the cap year ending October 31, 2012. *Id.* at ¶ 6.

There are two methods to calculate an aggregate cap: the streamlined method and the patient-by-patient proportional method. *Id.* at ¶¶ 14-15. Prior to the cap year 2012, the aggregate cap amount was calculated using the streamlined method, but beginning with the 2012 cap year, CMS instructed MACs to use the proportional method for calculating a hospice's aggregate cap. *Id.* at ¶¶ 14, 19. The proportional method, therefore, became the default method for calculating the aggregate cap for cap year 2012 and all subsequent cap years. However, certain eligible hospices were entitled to continue using the streamlined method so long as they made a one-time election "no later than 60 days after receipt of its 2012 cap determination." 42 C.F.R. § 418.309(d)(2)(ii). Plaintiff was eligible to elect to retain use of the streamlined method. SOMF ¶ 23.

The 2011 Federal Register directed that MACs "will provide hospices with instructions on how to elect a methodology in the coming months" regarding electing to continue using the streamlined approach. *See* 76 Fed. Reg. 47301, 47311 (Aug. 4, 2011). Palmetto's practice was to issue a notice entitled "Your Grandfathering Rights" as part of its 2012 cap determination, which informed the hospice provider of its right to elect to retain the use of the streamlined method and instructions on how to make that election. SOMF ¶ 25.

Palmetto contends that it provided Plaintiff with the appropriate notice of its "grandfathering rights" in an initial determination of Plaintiff's cap amount, which Palmetto claims

it sent on December 5, 2013. *Id.* at ¶ 28.[2] Plaintiff's office is located on the Miami Jewish Health campus. ECF No. [19-1] at 00038: Hrg. Tr. p. 34:6-25. Plaintiff shares the same address as Miami Jewish Health. *Id.* at Hrg. Tr. p. 35:1-15. All of Plaintiff's properly addressed mail goes first to the Miami Jewish Health's mailroom and it is then delivered to Plaintiff, where it is received by the receptionist. *Id.* at Hrg. Tr. p. 35:16-36:16. Plaintiff has no record of ever receiving the December 5, 2013 cap determination or Plaintiff's notice of its "grandfathering rights." SOMF ¶ 29. However, Plaintiff received the 2013 initial cap distribution, which used the same address as the December 5, 2013 letter. ECF No. [19-1] at 00073: Hrg. Tr. pp. 173:2-176:12.

In a letter dated September 25, 2015, Palmetto provided Plaintiff notice of a "REVISED Aggregate Cap Limitation Calculation" (the "Revised Notice") and issued an overpayment demand totaling $73,836.00, which amount was calculated using the proportional method. SOMF ¶¶ 30, 33. Plaintiff received this document, which also used the same address as the December 5, 2013 letter. ECF No. [19-1] at 00073: Hrg. Tr. pp. 173:2-176:12. The Revised Notice reflected that it was "reopening" the 2012 cap year determination. SOMF ¶ 31. The Revised Notice did not include the notice of "Your Grandfathering Rights." *Id.* at ¶ 34.

On or about December 12, 2015, Plaintiff timely filed an appeal of the Revised Notice with the Board on the basis that the Revised Notice should have been calculated using the streamlined method rather than the proportional method. ECF No. [19-1] at 00363-64. It maintained that it was never given the opportunity to elect the streamlined method for calculating cap liability because Plaintiff never received an initial cap determination letter for the 2012 cap year. *Id.* The Board

---

[2] Plaintiff had previously provided the name of the addressee, Mr. Todd Stern, the CEO of Plaintiff's parent company located in Illinois, and the Florida address to Palmetto. SOMF ¶ 70. Once the hospice provides the address to Palmetto, that same address is used until the hospice provider makes a change to it. *Id.*

6

held a hearing on Plaintiff's appeal on May 23, 2019. SOMF ¶ 39. During the hearing, the Board heard testimony and other evidence from the parties, including two witnesses who testified on behalf of Seasons, Maureen Corbett and Karl Scheribel, and one witness who testified on behalf of Palmetto, Stephanie Josephik. *Id.* at ¶ 40.

Maureen Corbett, Plaintiff's Director of Operations, was responsible for handling communications from Palmetto regarding Plaintiff's aggregate cap. *Id.* at ¶ 41. She did not know Jewish Miami Health's "exact process" in the mailroom but explained that staff in the mailroom would deliver mail addressed to "Seasons Hospice" to Plaintiff. ECF No. [19-1] at 00043, 45: Hrg. Tr. pp. 53:24-54:8, 61:3-13. She testified that when a letter addressed to Plaintiff's CEO (Mr. Stern) in Illinois was received, her receptionist date stamps it and then delivers it to her, and she would then scan it and email it to several people within one day of receipt. *Id.* at 00038-39: Hrg. Tr. pp. 36:7-38:10. However, this process was not always followed. SOMF ¶¶ 73, 75; ECF No. [19-1] at 00016. After she transmits the documents, she places a physical copy of the correspondence stapled together with a copy of the email she sent in her desk drawer. ECF No. [19-1] at 00039-40: Hrg. Tr. pp. 40:22-42:12. This file contains cap year determinations, but it does not contain the December 5, 2013 correspondence from Palmetto. ECF No. [19-1] at 00040: Hrg. Tr. pp. 42:4-44:24. When asked if it is possible that the December 5, 2013 letter was mailed to Mr. Stern's attention at Plaintiff's office yet did not come to her attention, Ms. Corbett stated that "anything is possible, and we work on a very large campus where the mail is handled by other people prior to it being delivered to us." ECF No. [19-1] at 00041: Hrg. Tr. pp. 47:25-48:10.

Karl Scheribel, Plaintiff's vice president and one of the individuals responsible for responding to cap determination notices, testified that he took steps to prepare his office for the receipt of the 2012 cap determination notices and the election process, and every Seasons location

7

that received a cap determination letter (and was eligible to elect to continue using the streamlined method) exercised its right to do so. SOMF ¶¶ 46-48. He stated that while 2012 letters for other Seasons facilities were received, Plaintiff did not send a letter to Palmetto electing to retain the streamlined method because the timeframe for receiving the letters "stretche[d] so long" and they assumed they would receive a letter from Palmetto. ECF No. [19-1] at 00053: Hrg. Tr. pp. 94:19-96:2.

On July 22, 2014, Mr. Scheribel received the cap determination letter for 2013, which letter applied the proportional method. ECF No. [19-1] at 00185-86. Upon receiving this letter, he pondered whether Plaintiff had "miss[ed] something" and had received correspondence yet "just didn't act on it." ECF No. [19-1] at 00054: Hrg. Tr. pp. 97:5-98:16. Although Mr. Scheribel conducted some internal investigation to see if the 2012 cap determination letter had been received but overlooked, he did not contact Palmetto as part of his investigation. *Id.* at Hrg. Tr. pp. 98:17-99:8. He also testified that for the 2013 cap year, he did not raise an issue with Palmetto or CMS. ECF No. [19-1] at 00055-56: Hrg. Tr. pp. 104:22-106:11. Plaintiff also submitted a self-determined cap using the proportional method for the 2014 cap year. ECF No. [19-1] at 00056: Hrg. Tr. pp. 106:12-108:4. Plaintiff only raised the issue of non-election of the streamlined method after it received the Revised Notice. ECF No. [19-1] at 00056-57: Hrg. Tr. pp. 108:14-109:12.

Stephanie Josephik, a Palmetto employee whose duties include preparing hospice cap determinations, testified about Palmetto's routine process for preparing and sending hospice cap determinations (which included having the letters placed in envelopes and then taken down to the mailroom), but she stated that there was nothing confirming that the December 5, 2013 letter was in fact sent. ECF No. [19-1] at 00071, 77-78: Hrg. Tr. pp. 167:12-168:6, 191:7-192:14, 195:10-18. Ms. Josephik stated that Palmetto's practice for the 2012 cap notices was for them to be drafted by

8

one employee and reviewed by another. SOMF ¶ 59. The preparer would generate a letter and sign it, which letter would then be sent to the reviewer who would review it, initial it, and input the letter into a computerized system so they could report back to CMS that the cap letter was completed. *Id.* Palmetto sent out approximately 2000 initial cap determination letters for the 2012 cap year, which were done in batches of 20 – 60 letters. *Id.* at ¶ 60. Palmetto used certified mail only for letters where there was an overpayment determination. Otherwise, regular mail was used. ECF No. [19-1] at 00072: Hrg. Tr. pp. 170:9-171:8. The December 5, 2013 letter did not make an overpayment determination.

Ms. Josephik stated that the December 5, 2013 letter at issue was signed by Louis Overbey, reviewed by Beth Burton and initialed by her on November 20, 2013, and was one of a batch of letters prepared by Mr. Overbey and transmitted to South Carolina to be mailed. ECF No. [19-1] at 00071-72, 76: Hrg. Tr. pp. 167:12-169:17, 187:7-188:20. Based on her review, the December 5, 2013 letter was both generated and sent out through Palmetto's normal batch process. ECF No. [19-1] at 00075: Hrg. Tr. pp. 181:21-182:3. The cap notices for the 2012 cap year for Palmetto's hospices were sent between April 2013 and April 2014. ECF No. [19-1] at 00074: Hrg. Tr. p. 180:11-16. She testified that she does not know of anything that would have delayed Plaintiff's mailing, and that she does not have any reason to believe that CMS asked Palmetto to delay sending out Plaintiff's cap notice for 2012. ECF No. [19-1] at 00075: Hrg. Tr. p. 181:2-20.

Palmetto did not receive complaints from other hospices that they did not receive the 2012 cap determination. Except for filing the appeal, Plaintiff did not inform Palmetto that it did not receive the 2012 cap determination or any of its other cap notices. ECF No. [19-1] at 00074: Hrg. Tr. p. 179:4-17.

On August 29, 2019, the Board issued a decision finding no error in the methodology used by Palmetto to calculate Plaintiff's aggregate cap limitation for the 2012 cap year. SOMF ¶ 52. The Board noted that Plaintiff did not have to wait until it received its 2012 cap determination to elect the streamlined method, and that the "evidence overwhelmingly establishes that the Medicare Contractor sent Seasons its 2012 cap determination letter on December 5, 2013 via regular U.S. mail, and that this letter included a document titled 'Your Grandfathering Rights.'" ECF No. [19-1] at 00016. The Board concluded that Plaintiff "failed to rebut the presumption that the December 5, 2013 letter with the grandfathering notice regarding Seasons' right to elect the streamlined method was properly sent by the Medicare Contractor. Rather, the evidence adduced at the hearing showed potential issues with Seasons' mail handling processes." *Id.* The Board further explained that Plaintiff "acknowledged that it is possible that the December 5, 2013 letter was received by Miami Jewish, but just never forwarded to Seasons by the Miami Jewish mailroom personnel." *Id.* Accordingly, the Board determined that the December 5, 2013 letter was "deemed received." *Id.*

### III. LEGAL STANDARD

The parties have cross-moved for summary judgment. Summary judgment is appropriate in cases in which a court is asked to review a decision rendered by a federal administrative agency. *U.S. Steel Corp. v. Astrue*, 495 F.3d 1272, 1279 (11th Cir. 2007). The Board's decisions are subject to review under the Administrative Procedure Act ("APA"), 42 U.S.C. § 1395oo(f)(1).

Under the APA, a court may set aside agency actions, findings, and conclusions if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "unsupported by substantial evidence." 5 U.S.C. §§ 706(2)(A), (E). This standard is "exceedingly deferential" to the agency. *Fund for Animals, Inc. v. Rice*, 85 F.3d 535, 541 (11th Cir. 1996). "The Court's role is to ensure that the agency came to a rational conclusion, 'not to conduct its own

investigation and substitute its own judgment for the administrative agency's decision." *Sierra Club v. Van Antwerp*, 526 F.3d 1353, 1360 (11th Cir. 2008) (citation omitted).

"To determine whether an agency decision [is] arbitrary or capricious, the reviewing court must consider whether the decision [is] based on a consideration of the relevant factors and whether there ha[s] been a clear error of judgment." *Fund for Animals*, 85 F.3d at 541 (quoting *N. Buckhead Civic Ass'n v. Skinner*, 903 F.2d 1533, 1538 (11th Cir. 1990)). "The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *see Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 376 (1989). Examples of arbitrary or capricious agency decisions include those where an agency considers material "Congress has not intended it to consider, entirely fail[s] to consider an important aspect of the problem, offer[s] an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc.*, 463 U.S. at 43.

Similarly, "'[t]he substantial evidence standard limits the reviewing court from deciding the facts anew, making credibility determinations, or re-weighing the evidence.'" *DeKalb Cty. v. U.S. Dep't of Labor*, 812 F.3d 1015, 1020 (11th Cir. 2016) (quoting *Stone & Webster Const., Inc. v. U.S. Dep't of Labor*, 684 F.3d 1127, 1133 (11th Cir. 2012)). "Substantial evidence . . . 'means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Under this standard, a court may "'reverse such findings only when the record compels a reversal; the mere fact that the record may support a contrary conclusion is not enough." *Id.* (quoting *Indrawati v. U.S. Att'y Gen.*, 779 F.3d 1284, 1304 (11th Cir. 2015)). Substantial evidence is "more than a scintilla, but

less than a preponderance." *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983). "Even when an agency explains its decision with 'less than ideal clarity,' a reviewing court will not upset the decision on that account 'if the agency's path may reasonably be discerned.'" *Alaska Dep't of Envtl. Conservation v. E.P.A.*, 540 U.S. 461, 497 (2004) (quoting *Bowman Transp., Inc. v. Arkansas–Best Freight System, Inc.*, 419 U.S. 281, 286 (1974)).

Through this lens, the Court considers the Motions and the parties' arguments.

## IV. DISCUSSION

Determining whether Plaintiff is entitled to relief raises two overarching issues. The first is whether the Board erred in interpreting and applying the hospice cap regulation, 42 C.F.R. § 418.309, such that hospice providers must elect to continue using the streamlined method upon receipt of the initial cap determination rather than upon receipt of a potential subsequent cap determination notice. The second is whether the Board erred in determining that the December 5, 2013 cap determination notice was sent to Plaintiff and in finding that Plaintiff failed to rebut the presumption that it received the letter. The Court will address each issue in turn.

### A. Trigger for electing the streamlined method

The hospice cap regulation, 42 C.F.R. § 418.309(d)(2)(ii), directs that for "cap years ending October 31, 2012, and all subsequent cap years, a hospice's aggregate cap is calculated using the patient-by-patient proportional methodology . . . subject to the following: . . . A hospice that is eligible to make a one-time election to have its cap calculated using the streamlined methodology must make that election no later than 60 days after receipt of its 2012 cap determination." *Id.* According to Plaintiff, the Board acted arbitrarily, capriciously, and in abuse of its discretion by incorrectly applying the language of the hospice cap regulation. ECF No. [26] at 21-26. In its view, a second election period is allowed where a cap determination is later reopened or revised. Hence,

Plaintiff contends that the September 22, 2015 notice activated a new sixty-day election period, and that Palmetto acted wrongfully by not including the "Your Grandfathering Rights" notice as part of that correspondence. Upon review, the Court finds that the Board did not err in its application of the regulation.

First, the December 5, 2013 letter does not state that it is an "initial" cap determination. ECF No. [19-1] at 00165. It instead states that it is the "final determination" for purposes of appeal rights. *Id.* That letter only became non-final and, by implication an "initial" determination, nearly two years later once the 2012 cap year determination was revised in September 2015. *Id.* at 00151. As of December 5, 2013, this was the only 2012 cap determination in effect, and Plaintiff cites to no evidence to show that, at that time, CMS planned subsequently to revise this cap determination or otherwise reopen it later. Accordingly, the Court rejects the premise that the December 5, 2013 letter was intended from the outset to be an "initial" (*i.e.*, temporary) cap determination letter. Therefore, starting the 60-day period from receipt of that letter was not improper under the plain language of the regulation.

Second, the regulatory framework does not state that a party is entitled to more than one election period or that an election period can be re-triggered in the event of reopening or revision to a cap determination. Rather, the regulation expresses that only a one-time election is permitted. Section 418.309(d)(2)(ii)'s election requirement, to be clear, does not state that it is contingent on subsequent treatment of a 2012 cap determination. Indeed, under Plaintiff's interpretation, a hospice's decision to elect or not elect to use the streamlined method is always subject to reassessment (and the granting of another sixty-day period) because a cap determination may later be reopened or revised, perhaps indefinitely. This reassessment would be permitted regardless of

13

the passage of time or the number of revisions that may subsequently be made. This construction of the regulation prevents finality and sows uncertainty and unpredictability.[3]

Third, Plaintiff's interpretation, which is not grounded in the regulation's text, is also not supported by the regulatory history. The right to make a one-time election was designed to prevent hospices from "switch[ing] back and forth between methodologies" as that would "greatly complicate the cap determination calculation, would be difficult to administer, and might lead to inappropriate switching by hospices seeking merely to maximize Medicare payments." 76 Fed. Reg. 47302, 47310 (Aug. 4, 2011). Indeed, the election was to be made once and quickly, so much so that it could be made even before the 2012 cap year determination was issued. *See id.* at 47311 ("[T]he hospice could elect for CMS to continue using the streamlined methodology at any time between October 1, 2011 . . . and up to 60 days after receipt of its 2012 cap determination. . . . We allow this 60 days *after* receipt of the 2012 cap determination because we are concerned that a hospice that intended to continue using the streamlined methodology might fail to elect it due to an oversight, and we do not want any provider to be forced to change methodologies due to such an error."). *Id.* (emphasis in original). Therefore, the regulatory framework envisions the receipt of the "initial" final 2012 cap determination (the December 5, 2013 letter) as triggering a one-time only 60-day election period.

---

[3] Plaintiff's related regulatory citation, 42 C.F.R. § 405.1889(a), which states that a reopened or revised cap determination "must be considered a separate and distinct determination or decision," does not support extending the election period. While that regulation cross-cites numerous other provisions, it does not reference § 418.309, it makes no mention of an election period generally, nor how a revision to a cap determination impacts the "one-time" only election right. Further, construing that regulation as granting a hospice an additional election period defeats the "one-time" only nature of the election specifically identified in § 405.309.

14

Accordingly, the Court determines that the Board did not act arbitrarily, capriciously, or abuse its discretion in determining that Plaintiff's sixty-day election period commenced upon receipt of the December 5, 2013 letter (as opposed to the September 22, 2015 letter).

### B. The Board did not err in applying the mailbox rule

The Board determined that Palmetto was correct to use the proportional method to calculate Plaintiff's aggregate cap for 2012 and all future years. ECF No. [19-1] at 00012, 17. In reaching this decision, it explained that Plaintiff could have elected the streamlined method before it received the 2012 cap determination, Plaintiff failed to rebut the mailbox rule presumption that the 2012 cap determination was sent to and received by Plaintiff, and consequently the December 2013 letter and notice were "deemed received." *Id.* at 00016. According to Plaintiff, the Board "disregarded the ample evidence provided by Seasons to support its position that it never received any initial cap determination notice for the 2012 cap year[.]" ECF No. [26] at 2. In doing so, Plaintiff maintains that the Board erred in applying the mailbox rule, and that even if the mailbox rule applied, Plaintiff rebutted the presumption that the December 5, 2013 letter and notice were received. *Id.* at 11-21. Upon review, the Court finds Plaintiff's arguments to be unconvincing.

"The common law has long recognized a rebuttable presumption that an item properly mailed was received by the addressee. The 'presumption of receipt' arises upon proof that the item was properly addressed, had sufficient postage, and was deposited in the mail. The presumption is, of course, rebuttable." *Konst v. Fla. E. Coast Ry. Co.*, 71 F.3d 850, 851 (11th Cir. 1996) (internal citation omitted). "Testimony concerning specific office procedures for preparing and mailing notices in addition to evidence of mail received from the purported sender at the same address (and by other designated recipients in the normal course) is sufficient to raise a presumption of properly mailed documents." *Kerr v. McDonald's Corp.*, 427 F.3d 947, 952 (11th Cir. 2005)

15

(citing *Gonzales Packing Co. v. East Coast Brokers & Packers, Inc.*, 961 F.2d 1543, 1544–46 (11th Cir. 1992)). *See also Wells Fargo Bus. Credit v. Ben Kozloff, Inc.*, 695 F.2d 940, 944 (5th Cir. 1983) ("Placing letters in the mail may be proved by circumstantial evidence, including customary mailing practices used in the sender's business.").

Here, it is uncontested that the December 5, 2013 letter and notice were not sent by certified mail. There is similarly no tracking documentation or testimony establishing conclusively that the correspondence was in fact received. Likewise, there is no direct evidence from Palmetto itself (such as a photocopy of an addressed and stamped envelope) confirming that it mailed the 2012 cap year determination correspondence to Plaintiff. Nonetheless, the record contains substantial evidence that supports the conclusion that Palmetto mailed the documents to Plaintiff, thus warranting the Board's application of the mailbox rule.

First, the Board heard detailed testimony regarding Palmetto's process of printing and mailing out almost 2,000 similar letters in 2013 for the 2012 cap determinations, which process included review of the December 5, 2013 correspondence by two employees, who signed and initialed the letter. The letter had a stamp on each page stating, "FILE COPY: Original sent to Provider." These 2012 cap year determination letters were prepared in batches of 20 to 60 letters, and all of the letters were sent out to hospice providers over a one-year period between April 2013 and April 2014. Palmetto did not receive complaints from any hospice that it had not received its 2012 cap determination. In fact, it was not until after the September 22, 2015 letter was received that Plaintiff challenged for the first time that it did not receive the December 2013 correspondence—even though it had received correspondence from Palmetto after December 2013 using the proportional method for calculating an aggregate cap. The record, moreover, does not reflect that the materials at issue were delayed, treated specially and uniquely, or not otherwise

16

processed and mailed in accordance with Palmetto's routine batch procedure, which involved mailing documents from South Carolina to the intended addressees.

Second, other correspondence from Palmetto had been sent to Plaintiff and received by them, both before and after the December 5, 2013 letter was issued. These materials included the same address as that listed in the December 2013 correspondence. Third, Plaintiff's office was located at the Miami Jewish Health campus, which campus included numerous entities that all received mail at one location. In this respect, Palmetto received its mail only after it was first received by Miami Jewish Health's mailroom (which facility did not include any of Plaintiff's employees), whose personnel sorted the mail, and then would bring it directly to Plaintiff. No evidence was presented regarding formal mailroom procedures, such as a written log showing all items received. Finally, Ms. Corbett, who was responsible for handling Palmetto communications regarding aggregate caps, acknowledged that it was possible that the December 5, 2013 correspondence was mailed to Plaintiff's office but did not come to her attention.

While the parties correctly note that certified mail would remove doubts as to whether the correspondence was actually mailed and received, certified mail is not a prerequisite for applying the mailbox rule. *See Barnett v. Okeechobee Hosp.*, 283 F.3d 1232, 1238 (11th Cir. 2002) ("While Barnett's statement and supporting documentation does not provide conclusive proof that he mailed a completed SF95 to the VA—as, perhaps, a certified mail receipt would provide—it does raise an inference that he did so."). Nor has Plaintiff established that the Board was not entitled to rely on the type of evidence presented to it at the hearing, both documentary and testimonial. Taken as a whole, the record reflects substantial evidence justifying application of the mailbox rule. The evidence presented allowed the Board to conclude that the December 5, 2013 materials were properly addressed, stamped, and mailed to Plaintiff. *See Ben Kozloff*, 695 F.2d at 944 (holding

that the mailbox rule presumption applied where testimony was presented regarding the mailing procedure used, and there was no evidence that the mail was returned as undeliverable). Accordingly, the Court next determines whether the Board erred in concluding that Plaintiff failed to rebut the presumption that it received the relevant correspondence.

"The presumption [of receipt] so arising is not a conclusive presumption of law, but a mere inference of fact[.]" *Konst*, 71 F.3d at 851 n.1 (quoting *Rosenthal v. Walker*, 111 U.S. 185, 193-94 (1884)). "[W]hen it is opposed by evidence that the letters never were received, must be weighed with all the other circumstances of the case, by the jury in determining whether the letters were actually received or not." *Id.* "The presumption of receipt may be rebutted . . . by producing evidence which would 'support a finding of the non-existence of the presumed fact.' The mere denial of receipt, without more, is insufficient to rebut the presumption. But direct testimony of nonreceipt, combined with other evidence, may be sufficient to rebut the presumption." *In re Farris*, 365 F. App'x 198, 200 (11th Cir. 2010) (internal citations omitted).

In concluding that Plaintiff failed to rebut the presumption that the December 2013 correspondence was properly mailed to Plaintiff, the Board noted evidence showed potential issues with Plaintiff's mail handling processes, inconsistencies in stamping and scanning mail, and Plaintiff's acknowledgment that it is possible that the correspondence at issue was actually received. ECF No. [19-1] at 00016. According to Plaintiff, the Board "ignored the considerable evidence showing that Seasons likely never received th[e] notice[.]" ECF No. [26] at 17. The Court does not agree and the record reflects substantial evidence supporting the Board's conclusion.

Evidence was also presented at the hearing that while Plaintiff was aware of the importance of timely making an election, it never reached out to Palmetto to complain about its alleged non-receipt of the 2012 cap determination. This is so even though it intended to make an election, was

prepared to do so, and other Seasons locations had received their notices and made their elections. But more importantly, Plaintiff received the 2013 cap determination letter, which calculated the cap using the proportional method, and yet it still did not contact Palmetto about the 2012 cap determination. Moreover, Plaintiff itself calculated its 2014 cap determination using the proportional method, not the streamlined method. Throughout this entire period, and despite its claimed non-receipt of the 2012 cap determination, it did not contact Palmetto or otherwise express to Palmetto or CMS that it wished to use the streamlined method for cap calculations. It was only after September 22, 2015, when Plaintiff received notice that an overpayment was demanded that it raised the issue of the missing 2012 cap determination for the first time. Accordingly, when viewing the record as a whole, substantial evidence exists that would allow the Board to conclude that Plaintiff failed to rebut the mailbox rule presumption. This determination was neither arbitrary, capricious, nor an abuse of discretion.

In sum, the Court finds that the Board's decision was not arbitrary and capricious, was supported by substantial evidence in the record, and in accordance with the law.

### V.    CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** as follows:

1. Plaintiff's Motion, **ECF No. [26]**, is **DENIED**.
2. Defendant's Motion, **ECF No. [31]**, is **GRANTED**.
3. To the extent not otherwise disposed of, any scheduled hearings are **CANCELED**, all pending motions are **DENIED** as moot, and all deadlines are **TERMINATED**.
4. The Clerk of Court shall **CLOSE** this case.

**DONE AND ORDERED** in Chambers at Miami, Florida, on October 1, 2020.

_____

**BETH BLOOM
UNITED STATES DISTRICT JUDGE**

Copies to:

Counsel of Record